IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


CHERYL AICHELE,

       Plaintiff,

v.

BLUE ELEPHANT HOLDINGS, LLC, a
domestic business corporation
doing business as the Human
Collective II, and DONALD
MORSE,

       Defendants.

3:16-cv-02204-BR

OPINION AND ORDER

CRAIG A. CRISPIN
ASHLEY A, MARTON
Crispin Employment Lawyers
1834 S.W. 58th Ave., Suite 200
Portland, OR 97221
(503) 293-5770

      Attorneys for Plaintiff

CAROLINE R. GUEST
KELLY S. RIGGS
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
222 S.W. Columbia St., Suite 1500
Portland, OR 97201
(503) 552-2140

      Attorneys for Defendants

BROWN, Judge.

    This matter comes before the Court on the Motion (#31) for

Summary Judgment and Motion (#36) for Discovery Sanctions filed

by Defendants Blue Elephant Holdings, LLC, and Donald Morse and the Motion (#47) for Partial Summary Judgment on Liability filed by Plaintiff Cheryl Aichele.

For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment, **DENIES** Defendants' Motion for Discovery Sanctions, and **DENIES** Plaintiff's Motion for Partial Summary Judgment.


## BACKGROUND

The following facts are taken from the parties' Joint Statement of Agreed Facts (#30) and summary-judgment materials and are undisputed unless otherwise noted.

Blue Elephant is an Oregon corporation that owns and operates a marijuana dispensary in Southwest Portland, which does business as "The Human Collective II" or "The Human Collective."

Morse is an owner of Blue Elephant and serves as the Managing Director of the corporation. As Managing Director Morse is authorized to make decisions regarding the day-to-day management of the dispensary's operations.

From November 10, 2015, until March 2016 Plaintiff was employed by Blue Elephant as a part-time "bud tender."

On January 28, 2016, Ric Leonetti, the manager of the store where Plaintiff worked, held a staff meeting at which he distributed and discussed Blue Elephant's new Employee Handbook. Plaintiff signed an acknowledgment of receipt of the Employee Handbook on that date.

In early February 2016 Plaintiff complained to Morse and/or Leonetti about alleged black mold on a vent in the restroom. Plaintiff also sent an instant message to Morse regarding this issue, but Morse denies he received any instant message at that time. Morse asserts he later heard about Plaintiff's mold complaint from Leonetti.

Also in February 2016 Plaintiff alleges she made approximately six oral complaints to Morse and/or Leonetti about internal doors being left unlocked or open, the door chime being deactivated, and the safe being left open.

On the afternoon of February 26, 2016, while Plaintiff and numerous other employees and customers were present, a customer walked behind the sales counter and attempted to open the door to the apothecary where most of the cannabis product is kept. While another employee helped the customer, Plaintiff went to Morse's office, told him that she did not feel safe, and asked Morse to handle the situation. Plaintiff also told Morse that she thought it would be nice if he hired an armed security guard.

On February 29, 2016, and March 1, 2016, Morse spoke with attorney Scott Snyder regarding Plaintiff's complaint that she did not feel safe after the customer walked behind the counter. Morse asked Snyder for legal advice regarding his options with respect to Plaintiff. Snyder advised Morse that Oregon is an at-will employment state and that the company could and should terminate Plaintiff's employment.

On March 4, 2016, at approximately 10:30 a.m. before the

store opened where Plaintiff worked, a music video was streaming to a TV monitor in the dispensary showroom. Plaintiff and four other employees (Cody Brown, Nick Harris, Eliav Cohen, and J. Cody Robertson) were working in the showroom.

The video is a total of seven minutes and 34 seconds and consists of two parts. The first part depicts a party scene, and the second part is more sexually graphic. Shortly after the second half of the video began to play, Plaintiff objected to the video being played and demanded that her co-workers turn it off. The parties disagree as to the words used and the manner in which Plaintiff stated her objection. As soon as Plaintiff objected to the video, one of her co-workers rushed to the computer controls to turn it off. Blue Elephant's security camera footage shows the video was turned off in less than 30 seconds after Plaintiff complained.

After the video was turned off, Plaintiff continued yelling at Brown and used profanity. Brown was considered the assistant manager of the store. Brown became upset, also yelled and used profanity, and told Plaintiff to leave work. Plaintiff did not leave.

Brown called Leonetti, who was not at work on the day of this incident, and told him what had happened. Leonetti asked to speak with Plaintiff. In graphic language Plaintiff told Leonetti that she was offended by the video.

At 10:45 a.m. that same day Leonetti sent a text message to Brown, Cohen, and Morse with the following instructions: "ONLY

THE MENU PLAYS ON THE TV SCREEN. IMMEDIATELY STOP PLAYING ANYTHING THE [*sic*] COULD BE OFFENSIVE TO ANYONE." Emphasis in original.

Plaintiff worked the remainder of her shift on March 4, 2016.

Later in the afternoon on March 4, 2016, Morse again called Snyder to inform him that Plaintiff had complained about sexual comments, conversations, music, and music videos being displayed in the dispensary. Morse told Snyder about the incident that had occurred with the video that morning, including Plaintiff's response and behavior during and after the incident. Morse asked Snyder for legal advice and reassurance as to what he should do with respect to Plaintiff. Snyder reiterated his advice to Morse to terminate Plaintiff.

On March 4, 2016, at 4:19 p.m. Morse sent the following text message to Leonetti: "I have been advised by our attorney to terminate Cheryls [*sic*] employment. If you care to discuss it please call me."

Plaintiff worked on March 5, 2016, but she was not scheduled to work on March 6, 2016.

On March 7, 2016, Plaintiff arrived at work at approximately 9:35 a.m., immediately handed an envelope to Leonetti, and told him that it was her "incident report and formal sexual harassment complaint." The written complaint set out her safety concerns arising from the customer walking behind the dispensary counter on February 26, 2016, and alleged sexual harassment, a hostile

work environment, and discriminatory conduct.

Leonetti took the papers to his office and began to review them. After a few minutes Leonetti called Plaintiff into his office. There is a dispute as to the details of this conversation, but the parties agree Leonetti told Plaintiff to go home for the day. The parties also agree Leonetti was the sole decision-maker to send Plaintiff home from work on the morning of March 7, 2016.

On March 7, 2016, at 11:22 a.m. after Plaintiff had gone home, she sent an email titled "Formal Sexual harassment & Hostile Work Environment Complaint #2" to Leonetti and others, including Morse. Plaintiff reiterated her earlier complaints; stated Leonetti had retaliated against her by sending her home that morning after she submitted her written complaints; and asked that Leonetti, Brown, Harris, and Cohen immediately resign or be terminated. Plaintiff also asked for her email to be forwarded to Morse.

After Morse reviewed Plaintiff's written incident reports and complaints, he called Snyder to update him on the situation and again asked for his advice on how to proceed. Leonetti was present and heard at least part of the telephone call. Morse told Snyder about Plaintiff's written complaints and asked Snyder whether that changed Snyder's advice in any way. Snyder again told Morse that Oregon is an "at-will employment state" and advised Morse to terminate Plaintiff.

On March 7, 2016, at 12:47 p.m. Morse called Plaintiff and

left her a voicemail asking to talk with her about her complaints and what had transpired that morning.  At 5:18 p.m. Plaintiff returned Morse's call and left him a voicemail.  At 5:40 p.m. Morse returned Plaintiff's call.  Plaintiff recorded the telephone call with Morse.  During the conversation Morse terminated Plaintiff's employment.

Aside from Snyder providing legal advice and recommending termination, the parties agree Morse was the sole decision-maker and that he made the decision to terminate Plaintiff's employment on March 7, 2016.  The parties also agree Morse was acting within the course and scope of his authority as an owner and Managing Director of Blue Elephant when he terminated Plaintiff's employment, and, as the Managing Director of Blue Elephant, Morse had the authority to make the decision to terminate Plaintiff without first consulting the Board of Directors or any other owner or manager of Blue Elephant.

On March 8, 2016, at 2:59 p.m. after speaking with a different attorney, Morse sent an email to Plaintiff and rescinded her termination.  Morse placed Plaintiff on paid administrative leave pending an investigation of her complaints.

On March 8 and 9, 2016, Blue Elephant issued written disciplinary actions to Brown, Harris, Cohen, and Leonetti regarding the video incident and Plaintiff's complaints.

On March 10, 2016, Plaintiff sent an email to Morse and attached copies of all of her written incident reports and complaints and provided a link to the song lyrics and a link to

the video.

On March 18, 2016, Defendants' attorney sent an email to Plaintiff's attorney and notified him that the investigation was complete and that Plaintiff would be placed back on the work schedule for shifts beginning March 22, 2016, at 12:30 p.m.

Plaintiff did not return to work on March 22, 2016.

On March 22, 2016, Defendants' attorney sent an email to Plaintiff's attorney and described the remedial efforts that Blue Elephant had taken in response to Plaintiff's complaints and notified him that Plaintiff was on unpaid administrative leave effective that date.

On March 23, 2016, Morse sent Plaintiff her final paycheck in which she was paid for her actual hours worked during the week of March 1-5, 2016, and her average of 20 hours per week for the weeks of March 6-12 and March 13-19, 2016. Plaintiff did not return to work after March 22, 2016.

Throughout her employment with Blue Elephant Plaintiff earned $10 per hour and worked an average of 20 hours per week. The parties agree Plaintiff did not suffer any economic loss or damages between March 7, 2016, and March 22, 2016. Moreover, Plaintiff does not seek recovery of any economic damages other than lost wages.

The parties agree after Plaintiff's employment with Blue Elephant ended in March 2016, Plaintiff did not seek employment until May 31, 2016, and she applied for only eight jobs between that date and December 4, 2016.

On May 17, 2016, Plaintiff filed a charge of unlawful employment practices with the Oregon Bureau of Labor and Industries, Civil Rights Division (BOLI), and the Equal Employment Opportunity Commission (EEOC).

On October 21, 2016, Plaintiff filed a complaint in Multnomah County Circuit Court against Defendants. Plaintiff alleged claims for retaliation pursuant to 42 U.S.C. § 2000e-3(a) and Oregon Revised Statutes §§ 659A.030(1)(f) and 654.053(5) and claims for retaliation for whistleblowing pursuant to Oregon Revised Statutes § 659A.199.

On November 22, 2016, Defendants filed a Notice of Removal in this Court.

**STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id*. "This burden is not a light one . . . . The non-moving party must do more than show there is

some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)). When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller*

*Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id*.

## **DISCUSSION**

Defendants contend there is not a genuine dispute of material fact, and, therefore, they are entitled to summary judgment on the grounds that (1) there is not any evidence of an adverse employment action by Defendants; (2) there is not any evidence of causation because (a) Defendants terminated Plaintiff based on the advice of counsel and/or (b) Plaintiff cannot establish she was terminated because she engaged in a protected activity; and (3) Plaintiff has not sustained any economic damages. Morse also contends he is entitled to summary judgment on Plaintiff's claims against him for aiding and abetting on the ground that such a claim cannot apply to him because he was the sole decision-maker. Defendants also seek sanctions for Plaintiff's discovery violations, including dismissal of Plaintiff's case.

Plaintiff, in turn, contends she is entitled to partial summary judgment on the issue of Defendants' liability on the grounds that the undisputed evidence supports her claims of retaliation and that the only issue in dispute is her damages.

## **I.   Defendants' Motion (#31) for Summary Judgment**

To establish a *prime facie* case of retaliation under both Title VII and Oregon law, Plaintiff must establish she engaged in

a protected activity, that she was subjected to an adverse employment action, and that a causal link exists between the two. *Reynaga v. Roseburg Forest Prods*., 847 F.3d 678, 693 (9th Cir. 2017).

After Plaintiff has established her *prima facie* case, the burden shifts to Defendant Blue Elephant to show a "legitimate, nonretaliatory reason for any adverse employment action taken" against the employee. *Id.* If Blue Elephant meets this burden, Plaintiff then "has the ultimate burden of showing [Blue Elephant's] proffered reasons are pretextual." *Id.*

### A. Protected Activity

The parties do not dispute that some of Plaintiff's complaints constituted protected activity.

### B. Adverse Employment Action

Defendants contend the Court should find Plaintiff's termination on March 7, 2016, is not an actionable adverse employment action because Plaintiff's termination was rescinded less than 24 hours later and Plaintiff did not suffer any economic loss because she was reinstated to paid administrative leave pending further investigation.

Plaintiff, however, contends sufficient facts exist to establish that she suffered an adverse employment action. Even if direct evidence did not establish an adverse employment action, Plaintiff contends a genuine dispute of material fact still exists because of the close temporal proximity of the events from which a jury could find Plaintiff suffered an adverse

employment action.

### 1.   The Law

For purposes of a retaliation claim an adverse
employment action is "any adverse treatment that is based on a
retaliatory motive" and is "reasonably likely to deter employees
from engaging in protected activity." *Ray v. Henderson*, 217 F.3d
1234, 1242, 1243 (9th Cir. 2000).  "[O]nly non-trivial employment
actions that would deter reasonable employees from complaining
about Title VII violations will constitute actionable
retaliation." *Reynaga*, 847 F.3d at 693 (citing *Brooks v. City of
San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)).  The severity of
an action's ultimate impact "goes to the issue of damages, not
liability." *Id.* at 1244 (citing *Hashimoto v. Dalton*, 118 F.3d
671, 676 (9th Cir. 1997)).

### 2.   Analysis

Plaintiff contends she suffered adverse employment
actions when Brown told her to go home following her complaints
about the video, when Leonetti sent her home after he reviewed
her formal written complaint, and when Morse terminated her after
he received her formal complaints about sexual harassment and
workplace safety.

The undisputed evidence shows Brown did not have the
authority to take any action against Plaintiff; Plaintiff did not
leave work when Brown told her to go home on March 4, 2016; and,
in fact, Plaintiff continued to work her full shift on March 4,

2016, and on the following day.  On March 6, 2016, however,
Plaintiff came to work at her scheduled time and presented
Leonetti with her written complaints.  Leonetti took Plaintiff's
complaints to his office and began to review them.  A few minutes
later Leonetti called Plaintiff into his office.  Although the
parties disagree as to the details of the conversation between
Plaintiff and Leonetti, the parties agree Leonetti told Plaintiff
to go home for the day.  Leonetti communicated Plaintiff's
complaints to Morse.  On March 7, 2016, Morse terminated
Plaintiff's employment.

Defendants contend their actions do not constitute an
adverse employment action because Leonetti did not suspend
Plaintiff but instead sent her home "because she was not in a
good place to help the customers or the business," and "if she,
in fact, felt threatened, then the best place for her would to
[*sic*] not be there."  Defendants further contend Plaintiff's
termination on March 7, 2016, lasted less than 24 hours, and she
was shortly  placed on paid administrative leave pending further
investigation.

On this record the Court concludes the Plaintiff has
established a *prima facie* case that Defendants' conduct after
Plaintiff complained about sexual harassment and workplace safety
constituted adverse employment actions that were reasonably
likely to deter Plaintiff and other employees from complaining in
the future about such conditions in the workplace.  Accordingly,
the Court concludes as a matter of law that the actions of

Leonetti and Morse constitute adverse employment actions.

**C.  Causation**

To establish a *prima facie* case of retaliation against Defendants Plaintiff must also show a causal link between her protected activity and Defendants' employment actions.

**1.  The Law**

To establish the requisite causal link, Plaintiff must prove her protected complaints were a "substantial factor" in Defendants' adverse employment actions.  *Pool v. VanRheen*, 297 F.3d, 899, 910 (9th Cir. 2002)(citing *Seitz v. State ex rel. Albina Human Res. Ctr.*, 100 Or. App. 665, 675 (1990)).

Causation may be inferred from "proximity in time between the protected action and the alleged retaliatory employment decision." *Ray*, 217 F.3d at 1244 (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).  *See also Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 507 (9th Cir. 2000)(noting causation can be inferred from timing alone).

**2.  Analysis**

Here the undisputed evidence shows Defendants' adverse employment actions occurred on the day of and the day following Plaintiff's complaints.  On the basis of that timing, reasonable jurors could infer causation between Plaintiff's protected activities and Defendant's adverse actions.

Defendants contend, however, Plaintiff was not terminated because of her complaints, but rather because of the

unreasonable demands she made in connection with her complaints; *i.e.*, Defendants assert Plaintiff unreasonably demanded Defendant Blue Elephant hire an armed security guard to address workplace safety issues and that Blue Elephant terminate the employees involved in the video incident, including the store manager.

Plaintiff, on the other hand, contends she did not demand or even ask the company to hire a security guard, but she told Morse that it would be a "nice idea." Plaintiff also contends she wanted to "have a conversation about what had happened, what steps had been taken, what safeguards would be put in place" to "insure that those things were not continuing." Plaintiff testified she didn't think a reprimand was "enough compared to the other disciplinary actions" and that termination of the other employees "should be at least considered." Plaintiff, however, contends she did not ask for the employees' termination as a condition of her return to work.

On this record the Court concludes there is a genuine dispute of material fact regarding the reasons for Plaintiff's termination, and, therefore, causation is an issue for the jury to decide. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment on this basis.

### D. Advice of Counsel

Defendants contend even if Plaintiff suffered adverse employment actions, her claims should be dismissed because Defendants' decision to terminate Plaintiff was based on their good-faith reliance on the advice of counsel.

Plaintiff, however, contends the advice-of-counsel defense is not applicable and is not a complete defense to her claims. Plaintiff also contends Defendants have not shown reasonable reliance on advice of counsel, and, therefore, this is an issue for a jury in determining motivation for Defendants' actions.

### 1.    The Law

The parties do not cite and the Court has not found any Ninth Circuit case that addresses the defense of good-faith reliance on the advice of counsel in the context of an employment retaliation case, and the cases from other jurisdictions cited by the parties do not directly address this issue.  The Court notes, however, that the Tenth Circuit held in *McGowan v. City of Eufala* that "an employer cannot immunize itself from Title VII liability by following the advice of its lawyers."  472 F.3d 736, 747 (10 Cir. 2006).  The court noted:  "If the reason for the claimed adverse action does not flow from a discriminatory motive, it lacks the requisite causal connection to the adverse action." *Id.*  The court concluded it was "entirely reasonable" under the circumstances of that case for the defendant to follow the advice of counsel, and, therefore, the plaintiff had failed to support her argument that the defendant's reason for taking the employment action was a pretext.

### 2.    Analysis

Morse testified he first spoke to his attorney regarding Plaintiff on February 29, 2016, about Plaintiff's safety complaints arising from the customer incident on

February 26, 2016.  Morse next talked to his attorney on March 1, 2016, and told the attorney that he had not terminated Plaintiff's employment because Plaintiff's complaints were not "egregious enough at that point to terminate her."  According to Morse, the attorney referred to Plaintiff as "a troublemaker" and advised Morse to terminate her.

Morse testified he had not made any decision to terminate Plaintiff's employment as of March 3, 2016.  Morse also testified he would not have terminated Plaintiff on March 4, 2016, if she had not complained "because other people would have complained about what transpired that day."

Morse further testified as follows:

Q.  Was it solely because of [the attorney]'s advice that you terminated [Plaintiff]?

A.  Well, yeah, it was solely based on his advice that I could do so.

Q.  And did you have a desire to terminate [Plaintiff] if you got his statement that you could do so?

A.  I don't think so.  As I've stated here . . . I didn't think it was fair to terminate her until I'd received her side of the story, *et cetera*.

You know, even getting her on the phone, I think I was hoping for her to be less, you know, curt, and maybe a little more -- I don't think "conciliatory" is the right word, but to help find

a way that we could work this out where she would

feel that she has a safe work environment and

something within reason that would be doable by

me.  But the tone and tenor of how the

conversation began, and whatnot, kind of led me to

believe that that's not -- wasn't possible.

Q.  If I understand you correctly, at the

beginning of the conversation, you had not made

the decision yet to terminate, but by the end of

the conversation, you had?

A.  Well, I'd made the decision that it was

possible for me to terminate her but would like to

-- would like to work something out.

The Court notes there is not current binding precedent that establishes the advice of counsel is a complete defense to a retaliation claim.  Instead the advice of counsel is merely one factor to consider when making a determination of a causal connection between the adverse action and the employer's motivation.  See *McGowan v. City of Eufala*, 472 F.3d 736, 746-47 (10th Cir. 2006)("We thus look to motive in addition to consequences.  If the reason for the claimed adverse action does not flow from a discriminatory motive, it lacks the requisite causal connection to the adverse action.  Here, it was entirely reasonable for an employer in the City's legal circumstances to follow the advice of counsel. . . .")

Although there is some evidence in this case that

Defendants believed they had the right to terminate Plaintiff's
employment based on the advice of counsel, it is not clear that
the decision to do so was based solely on that advice.
Defendants assert other factors were taken into consideration
such as Plaintiff's personal hygiene, her on-going note-taking,
and her unreasonable demands regarding the video incident.

On this record the Court concludes there is a genuine
dispute of material fact as to the causation between the adverse
employment action and Defendants' motivation.  Accordingly, the
Court **DENIES** Defendants' Motion for Summary Judgment on this
basis.


**E.    Aiding and Abetting**

Defendants contend Plaintiff's state-law retaliation claims
asserted against Morse should be dismissed on the ground that he
cannot be held individually liable.

Plaintiff, in turn, contends she seeks to hold Morse liable
based on his own conduct rather than his acts on behalf of the
corporate entity and that Morse acted to "effectuate the
employer's violation" of state law.

Plaintiff asserts three state-law claims of retaliation
arising from her (1) complaints about sexual harassment and a
hostile work environment pursuant to Oregon Revised Statutes
§ 659A.030(f), (2) complaints about safety violations pursuant to
Oregon Revised Statutes § 654.062(5), and (3) whistleblowing
pursuant to Oregon Revised Statutes § 659A.199.  Plaintiff

alleges Morse is individually liable pursuant to Oregon Revised Statutes § 659A.030(1)(g) "as an aider and abettor" because he "acted to help, assist, or facilitate the commission of the unlawful employment practices alleged . . ., promoted the accomplishment thereof, helped in advancing or bringing them about or in encouraging, counseling or inciting as to their commission."

The parties agree the following are the three specific retaliatory acts on which Plaintiff's claims are based: (1) Brown directed Plaintiff to leave work on March 4, 2016; (2) Leonetti sent Plaintiff home from work on the morning of March 7, 2016; and (3) Morse terminated Plaintiff's employment on March 7, 2016. The parties do not dispute Morse was the sole decision-maker who acted within the course and scope of his authority as an owner and as the Managing Director of Blue Elephant when he terminated Plaintiff's employment.

### 1. The Law

Section 659A.030(1)(g) provides it is an unlawful employment practice "[f]or any person, whether an employer or employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." Courts have not identified the elements for aiding and abetting under § 659A.030(1)(g).

In this District courts have held a primary actor in an employee's termination cannot be held liable pursuant to this statute for aiding and abetting when that person was the primary

decision-maker and acting pursuant to their authority. *See,*
*e.g., Hannan v. Bus. Journal Publ's, Inc.*, No. 3:14-cv-00831-SB,
2015 WL 9265959 (D. Or. Oct. 2, 2015); *Peters v. Betasee, Inc.*,
No. 6:11-cv-06308-AA, 2012 WL 5503617, at *7 (D. Or. Nov. 9,
2012)("plaintiff's claim against [president of the company] for
aiding and abetting under § 659A.030(1)(g) makes little sense
under the plain meaning of the statute"); *White v. Amedisys*
*Holding, LLC*, No. 3:12-cv-01773-ST, 2012 WL 7037317, at *5 (D.
Or. Dec. 18, 2012)(it is not aiding and abetting if the named
"employee is legally equivalent to the employer . . . or arguably
when exercising 'executive authority' as in *Peters*"); *Sniadoski*
*v. Unimart of Portland*, No. 93-cv-1051-MA, 1993 WL 797438, at *2
(D. Or. Oct. 29, 1993)("aiding and abetting liability makes
little sense against an employee alleged to be an active
participant in the asserted harm").

### 2. Analysis

The parties agree Morse was the sole decision-maker and
acted within the course and scope of his authority as Managing
Director at the time that he terminated Plaintiff's employment.

On this record, therefore, the Court concludes Morse
cannot be individually liable as to Plaintiff's retaliation
claims based on aiding and abetting pursuant to § 659A.030(1)(g).
Accordingly, the Court **GRANTS** Defendants' Motion and **DISMISSES**
**with prejudice** Plaintiff's Second, Third, and Fourth Claims
against Morse.

### F. Economic Damages

Defendants contend even if Plaintiff's claims survive, there is insufficient evidence from which a reasonable jury could award Plaintiff damages. Alternatively, Defendants contend Plaintiff should be barred from recovering any damages for the period after March 22, 2016, when she was notified she could return to work and failed to do so.

Plaintiff, however, contends the issue of damages is a fact question to be submitted to a jury.

**1. The Law**

"[A]bsent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential back pay liability." *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 241 (1982).

**2. Analysis**

In her Complaint Plaintiff seeks compensatory damages for personal, noneconomic damages including physical and emotional pain and suffering, mental anguish, humiliation, embarrassment, and loss of enjoyment of life.

The parties agree Plaintiff did not suffer any economic damages between March 7 and March 22, 2016. The parties further agree Plaintiff seeks economic damages only for lost wages.

Defendants contend they took remedial steps following the investigation of Plaintiff's complaints. Defendants assert they issued written corrective actions, arranged additional training, hired a new employee to be responsible for compliance issues, and instructed employees regarding treatment of Plaintiff

upon her return.  Defendants assert they notified Plaintiff about these actions and that she could return to work.  Plaintiff, however, did not return to work after March 22, 2016.

The parties agree after Plaintiff's employment ended in March 2016, Plaintiff did not seek employment until May 31, 2016, and has only applied for eight jobs between May 21, 2016, and December 4, 2016.

The parties dispute the reason for Plaintiff not returning to employment after March 22, 2016; the amount of her economic damages for lost wages; the amount of her noneconomic damages; and whether she failed to mitigate her damages.

On this record the Court concludes a genuine dispute of material fact exists.  Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment on this issue.

## II.  Plaintiff's Motion (#47) for Partial Summary Judgment

Plaintiff contends she is entitled to judgment as a matter of law as to Defendants' liability.  Defendants contend, based on the same reasons stated in their Motion for Summary Judgment, that Plaintiff's Motion should be denied.

For the reasons set forth above, the Court concludes genuine disputes of material fact exist as to the causal link between Plaintiff's protected activity and the adverse action taken by Defendants.  Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment.

## III. Defendants' Motion (#36) for Discovery Sanctions

Defendants seek dismissal of this case based on Plaintiff's

alleged discovery violations.  Defendants contend Plaintiff has
failed to respond timely to discovery requests and has belatedly
produced many of the discovery documents.  As a result,
Defendants contend they have been severely prejudiced.
Alternatively, if the Court does not dismiss Plaintiff's action,
Defendants seek various sanctions including striking Plaintiff's
claims for damages, prohibiting Plaintiff from asserting
liability or damages based on late-disclosed evidence, and
awarding attorneys' fees and costs to Defendants.

Plaintiff concedes she failed to respond timely to some of
Defendants' discovery requests, but she asserts Defendants are
engaged in "scorched earth" litigation and Defendants' discovery
requests have lacked proportionality to the case.

**A.    Background**

Plaintiff originally filed this action in state court and
characterizes this action as a "relatively uncomplicated
employment retaliation matter concerning straightforward issues
of liability and damages."  On November 22, 2016, Defendants
properly removed the case to this Court.

On December 22, 2016, Defendants served their First Set of
Interrogatories and First Request for Production to Plaintiff.

On January 5, 2017, the Court set initial case-management
deadlines for the completion of discovery by May 19, 2017, and
the filing of dispositive motions by June 19, 2017, as well as a
trial date of January 9, 2018.

On February 2, 2017, Plaintiff served her Responses to these

requests.  In February a dispute also arose between the parties
concerning subpoenas for Plaintiff's employment records.  On
February 17, 2017, the Court informally resolved that issue.

On March 24, 2017, following conferral between the parties
regarding the completeness of Plaintiff's responses to
Defendants' requests, Plaintiff agreed responsive documents would
be produced by April 3, 2017.

Plaintiff's deposition was tentatively scheduled for
April 10, 2017.  On approximately March 27, 2017, the parties
scheduled Plaintiff's deposition for May 15, 2017.

On April 10, 2017, Plaintiff served a Supplemental Response
to Defendants' First Interrogatories.  Between April 10 and
May 11, 2017, Plaintiff produced approximately 500 additional
pages of documents.

On April 26, 2017, the parties again brought discovery
disputes to the Court regarding the subpoena of Plaintiff's
medical records and requested an extension of discovery and
motion deadlines.  The Court again informally resolved these
discovery issues.

On May 4, 2017, pursuant to the agreement of the parties,
the Court extended the deadline to complete discovery to June 30,
2017, and the deadline to file dispositive motions to August 7,
2017.

On May 15, 2017, Plaintiff's deposition was taken by
Defendants.  During her deposition Plaintiff provided a Second
Supplemental Response to Defendants' First Interrogatories.

On May 25, 2017, Defendants served a Second Set of Interrogatories, Second Request for Production of Documents, and First Requests for Admissions on Plaintiff.

On May 30, 2017, Plaintiff filed a Motion to Compel for discovery regarding Defendants' proposed amendment of their Answer by adding an advice-of-counsel defense. On June 9, 2017, the Court resolved Plaintiff's Motion.

On June 29, 2017, Plaintiff requested an extension until June 30, 2017, to provide responses to Defendants' May 25, 2017, discovery requests. Defendants agreed to an extension to July 7, 2017, for Plaintiff to respond to Defendants' interrogatories and request for production, but they did not agree to an extension regarding the requests for admission. Also on June 29, 2017, Plaintiff served her Responses to Defendants' Request for Admissions.

On July 11, 2017, Plaintiff produced 2,057 documents.

On July 12, 2017, Plaintiff served her Response to Defendants' Second Set of Interrogatories and Second Request for Production of Documents. On that date Plaintiff also served her Third Supplemental Response to Defendants' First Interrogatories.

On July 28, 2017, Plaintiff served her Amended Third Supplemental Response to Defendants' Interrogatory No. 12.

On August 7, 2017, in conjunction with the filing of their Motion for Summary Judgment, Defendants filed their Motion for Discovery Sanctions.

**B.    The Law**

Federal Rule of Civil Procedure 37(d) allows the Court to order sanctions when a party fails to respond to discovery requests. The sanctions the Court may order include prohibiting admission of evidence, striking pleadings, or dismissing an action. Fed. R. Civ. P. 37(b)(2). Only a finding of "willfulness, bad faith, and fault" will justify a sanction of terminating an action. *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 483 F.3d 1091, 1096 (9th Cir. 2007).

The Ninth Circuit follows a five-part test to determine whether case-dispositive sanction under Rule 37 is appropriate: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* "This test is not mechanical. It provides the district court with a way to think about that to do, not a set of conditions precedent for sanctions or a script that the district court must follow[.]" *Id.*

The determination to impose sanctions for discovery violations and what sanctions are appropriate is within the discretion of the court. *Id.*

**C. Analysis**

The Sixth Circuit has noted:

> The promulgation of the Federal Rules of Civil Procedure ushered in a new era of federal litigation, directed to the goal of securing "the just, speedy and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. It would be reasonable to expect, in light of all the applicable

rules and governing precedents, that experienced
attorneys, especially those who have handled major
litigation, would be able to proceed through the
discovery and pretrial stages with a conciliatory
attitude and a minimum of obstruction, and that, under
the guiding hand of the district court, the path to
ultimate disposition would be a relatively smooth one.

*Grider v. Keystone Health Plan Cent., Inc.,* 580 F.3d 119, 123
(6th Cir. 2009). This Court agrees with the Sixth Circuit's
sentiments, which are applicable in this case to both sides.

The record reflects Plaintiff has been dilatory in
responding to requests for discovery. Plaintiff attempts to
justify her conduct based on the "scorched earth" litigation
tactics of the Defendants and Plaintiff's lack of support staff
to meet Defendants' "disproportional" discovery demands.
Plaintiff, however, has not sought an order from the Court to
protect her from "annoyance, . . . oppression, or undue burden or
expense" pursuant to Rule 26(c).

Similarly, although the parties have tried to resolve some
of their disputes without the Court's intervention, Defendants
have not filed any motion to compel production by Plaintiff nor
asked for a continuance of the discovery deadline or the deadline
to file dispositive motions in order to complete and to review
discovery.

The Court set specific deadlines for the filing of discovery
motions and encouraged the parties to contact the Court to
resolve discovery disputes informally. In addition, the parties
were aware of discovery deadlines and the necessity to complete
discovery in a timely fashion. Thus, Defendants cannot now

complain that Plaintiff has not complied with discovery deadlines when Defendants allowed extensions without taking any action when the extensions were not met.

In the exercise of its discretion, the Court concludes dismissal of this action is not warranted as a sanction. The Court also concludes other alternative sanctions requested by Defendants are unwarranted with the exception of the Defendants' request for the opportunity to depose Plaintiff further. The Court will allow Defendants to depose Plaintiff for an additional two hours regarding only those documents produced at the time or subsequent to her earlier deposition. The Court also directs the parties to complete Plaintiff's continued deposition **no later than November 30, 2017**. The Court will not entertain any further fact-discovery disputes between the parties, and all deadlines previously set by the Court remain in effect.

## CONCLUSION

For these reasons the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment, and, accordingly, **DISMISSES with prejudice** Plaintiff's Second, Third, and Fourth Claims against Defendant Donald Morse. In addition, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment and **DENIES** Defendants' Motion for Discovery Sanctions except as noted.

IT IS SO ORDERED.

DATED this 13th day of November, 2017.

/s/ Anna J. Brown
_____
ANNA J. BROWN
United States Senior District Judge